FILED
2019 May-06  AM 09:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **GAS POS, INC.,** ) | |
| **ANONYMOUS TRUCK STOP, ABC,** ) | |
| ) | |
| **PLAINTIFFS,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.:** |
| ) | **JURY TRIAL DEMANDED** |
| **COMDATA NETWORK, INC., and** ) | |
| **FLEETCOR TECHNOLOGIES, INC.,** ) | |
| ) | |
| ) | |
| **DEFENDANTS.** ) | |

## COMPLAINT

### I.    SUMMARY

1.    This case is brought on behalf of the named Plaintiffs, Gas Pos, Inc., Anonymous Truck Stop ABC, and the members of the putative class of similarly situated individuals they represent (the "Class") to seek reimbursement of artificially and illegally inflated fees and costs charged by the named Defendants, Comdata Networks, Inc. and FleetCor Technologies, Inc., which are Fleet Card payment and truck stop point of sale companies, due to monopolistic and anticompetitive practices under Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2), Section 16 of the Clayton Act (15 U.S.C. § 26).

### II.    PARTIES

2.    Plaintiff Gas Pos, Inc. ("GP") is a Delaware Corporation with offices, including its legal department offices, in Jefferson County, Alabama.

3.       Plaintiff Anonymous Truck Stop ABC[1] ("ABC") is an Truck Stop located in Southeast Louisiana. During the class period defined below, Plaintiff ABC accepted Fleet Cards issued by Defendant Comdata and Defendant FleetCor, paid fees directly to Defendant Comdata, and was injured by paying higher fees due to the illegal conduct described herein.

4.       Defendant Comdata Network, Inc. ("Comdata") is a Delaware corporation with its corporate headquarters in Brentwood, Tennessee, which does business in Alabama.

5.       Defendant FleetCor Technologies, Inc. ("FleetCor") is a Delaware corporation with its corporate headquarters in Norcross, Georgia, which does business in Alabama.

6.       Comdata, which FleetCor acquired in 2014, is a wholly-owned subsidiary of FleetCor. FleetCor authorized, controlled, and participated in the conduct at issue in this Complaint, and is directly liable for the damages incurred by Plaintiffs and the proposed Class (defined below).

7.       FleetCor's strategic acquisitions over the past decade have enabled FleetCor and Comadata to gain monopoly power in the Fleet Card POS systems Market and the Fleet Card Market. Although the FTC has previously entered into a consent order to regulate the monopolistic nature of Defendants' treatment of the Market, Defendants

---

[1] Plaintiff Anonymous Truck Stop ABC is a real company currently doing business and operating under an active Merchant Agreement with Defendant Comdata. Due to the monopolistic nature of Defendants' business, Plaintiffs' reliance on Defendants' products in the current markets, and Defendants' history of retaliatory behavior, Plaintiff Anonymous Truck Stop ABC files this Complaint on behalf of the putative Class anonymously at this time until such time as they receive assurances that Defendants will not retaliate against them by withdrawing their ability to process Defendant Fleet Card transactions.

have violated the terms of said consent orders during their term, and certain relevant provisions of said consent orders are not presently in existence.

### III.   JURISDICTION AND VENUE

8.      The claims set forth in this Complaint arise under Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2) and seek treble damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15(a)). In addition, Plaintiffs seek injunctive relief pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26). This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1337(a).

9.      Venue is proper in the Northern District of Alabama under 28 U.S.C. § 1391(b) and 15 U.S.C. § 22 because (a) Defendants reside, transact business, committed an illegal or tortious act, have an agent, and/or are found in this District, (b) Plaintiff GP operated its business in this District for a large period relevant to this Complaint, and continues to have an office and do business in this District, (c) a substantial portion of the work performed by Plaintiff GP to complete the certifications in order to process Defendants' Fleet Cards was performed in this District, and (d) a substantial portion of the events described herein have been carried out in this District.

### IV.   BACKGROUND

10.     GP is in the business of selling point of sale systems and providing payment processing services to merchants in the retail sector, including gas stations, Truck Stops, travel plazas, marinas, and convenience stores.

11.     Defendant Comdata and Defendant FleetCor (hereinafter collectively "Defendants") are also in the business selling point of sale systems and providing

payment processing services to merchants in the retail sector, including gas stations, Truck Stops, travel plazas, marinas, and convenience stores.

12.     In addition to point of sale systems and payment processing services, Defendants also have a proprietary line of Fleet Card solutions offered to commercial customers.

13.     This case arises from Defendants' anticompetitive conduct in the Markets for (i) Fleet Card services to over the road trucking companies, (ii) Fleet Card Point of Sale systems, and (iii) Truck Stops.

14.     The Market for the provision of Fleet Card services is highly concentrated.

15.     Defendants have monopoly power in the Markets for Fleet Card services and Fleet Card Point of Sale systems.

16.     Defendants have abused their monopoly power in the Fleet Card Market and Fleet Card Point of Sale systems Market by:

a.      Refusing to allow third party point of sale systems to accept or process Defendants' proprietary Fleet Cards;

b.      Entering into agreements with a third party company that supposedly had an unrestricted license to process Defendants' Fleet Cards in order to block Plaintiff GP's entry into the Marketplace, and further evidencing Defendants' retained monopolistic control over the Market;

c.      Refusing to allow merchants to process Fleet Card transactions using Plaintiff GP's point of sale system, although Plaintiff GP had completed the certifications to do so;

d.      Refusing to grant Plaintiff GP a license to process Fleet Card transactions using Plaintiff GP's point of sale system, although Plaintiff GP has completed the certifications to do so;

e.      Refusing to allow third party companies to compete with Defendants in the Fleet Card or Fleet Card Point of Sale Marketplace;

f.      Threatening legal action against Plaintiff GP and any merchants using Plaintiff GP's point of sale system to process Fleet Card payments which are processed using alternative means which do not violate any contracts or patents held by Defendants.

17.     Through anti-competitive behavior, Defendants have successfully, artificially inflated the value of their services by entering into agreements among themselves and other companies to prevent other, more competitive companies from entering the Marketplace with competing products.

18.     Plaintiff GP has demonstrated that it can offer the same Fleet Card Point of Sale system services at a significantly cheaper price to the merchants and ultimately to the end user-consumers but for Defendants artificially and illegally barring Plaintiff GP's access to the Market.

19.     Defendants and other third parties conspired to and did unreasonably restrain trade through the anticompetitive agreements and actions described above, specifically including instructing and agreeing with a third party company to prevent Plaintiff GP from entering into the Marketplace, and other aspects of Defendants' plan, which maintained and preserved Defendants' monopoly power in the Fleet Card Market, and thereby maintained Defendants' ability to impose artificially inflated and exorbitant fees on merchants.

20.     The anticompetitive conduct alleged herein constitutes an unlawful scheme and conspiracy to acquire and maintain monopoly power in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. Each agreement in furtherance of Defendants' scheme, including the quid pro quo and each action or contract containing any of the anticompetitive or exclusionary provisions described herein, including their refusal to deal in order to maintain monopolistic control of the Fleet Card and truck stop point of sale Markets, constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, as does the scheme as a whole. The Defendants' conduct has had the purpose and effect of allowing Defendants to maintain and enhance their monopoly power and charge supracompetitive prices to Plaintiff GP and otherwise to cause harm to competition more generally.

## V.     PLAINTIFFS' FACTS

21.     Plaintiff GP is in the business of selling point of sale systems and providing payment processing services to merchants in the retail sector, including gas stations, Truck Stops, travel plazas, marinas, and convenience stores.

22.     Plaintiff GP requested and was granted access to the coding and certification requirements in order to process Defendants' Fleet Cards on GP's proprietary point of sale system.

23.     After the certification was complete, Defendants refused to honor said certification, and have disallowed GP from natively processing payments for Defendants' Fleet Cards on GP's point of sale system.

24.     While GP was prevented from natively processing payments for Defendants' Fleet Cards, GP developed a way to accept payments from Defendants' Fleet

Cards using a proprietary system based on Defendants' existing contracts with its merchants.

25.    Said proprietary methods of accepting Defendants' Fleet Cards allows GP to compete with Defendant Comdata by offering acceptance of the same Fleet Cards to Truck Stops at a price that is significantly less than the currently artificially inflated rates.

26.    In order to maintain control of its monopolistic hold on the Fleet Card and truck stop point of sale Markets, and keep prices artificially inflated, Defendant Comdata has attempted to interfere with GP's method of accepting Fleet Card payments and has threatened legal action if GP does not cease acceptance of Defendants' Fleet Cards.

27.    Plaintiff ABC is an independent truck stop located in Southeast Louisiana. During the class period defined below, Plaintiff ABC accepted Fleet Cards issued by Defendant Comdata and Defendant FleetCor, paid fees directly to Defendant Comdata, and was injured by paying higher fees due to the illegal conduct described herein.

28.    Plaintiff ABC has installed GP's point of sale system and is able to accept Defendants' Fleet Cards using GP's proprietary methods in accordance with existing laws and ABC's contract with Defendants.

29.    As the direct result of Defendants' anticompetitive behavior in disallowing GP to natively process payment for Defendants' Fleet Cards, ABC is forced to pay higher transactional fees to Defendants.

A.  **MONOPOLY POWER IN RELEVANT MARKETS**

30.    The relevant Markets to this case are:

a.    The Trucker Fleet Card Market ("Fleet Card Market"). The Market in the United States for specialized Trucker Fleet Cards that provide to trucking companies

operating long-haul, heavy duty trucks at least the following functions: credit or facilitation of direct billing by Truck Stops to the trucking companies for purchases made by Truckers; convenient means of payment; transaction security; widespread acceptance at Truck Stops; specialized data collection services; and the ability of trucking companies to exercise control over Trucker purchases.

b.      The Fleet Card and Truck Stop Point of Sale Systems Market ("Fleet Card Point of Sale Market"). The Market for providing to Truck Stops, gas stations, marinas, and convenience stores in the United States universal point-of-sale computer systems that are capable of the following: processing transactions using commercially available Trucker Fleet Cards, including those owned and operated by Defendants; verifying authorization of Trucker Fleet Card transactions; collecting and transmitting data (e.g., location, date, and gallons of fuel) while processing Trucker Fleet Card transactions; and imposing restrictions on purchases made with Trucker Fleet Cards.

31.     Each of these Markets is limited geographically to the United States.

32.     Defendants have monopoly power in the Trucker Fleet Card Market and the Fleet Card Point of Sale Market.

### i.  The Fleet Card Market

33.     Long-haul "over the road" Fleets and drivers who work for Fleets, operate heavy duty tractor-trailer trucks that transport enormous volumes of freight throughout the United States. Long-haul Truckers generally purchase diesel fuel, meals, and other supplies and services at Truck Stops while traveling. Long-haul "over the road" Fleets require extensive Purchase Control and Data Capture features that are offered exclusively by Trucker Fleet Cards.

34.     During point-of-sale transactions Trucker Fleet Card companies collect and transmit purchase information and other data from truck drivers (buying fuel and other products at the truck stop) to their respective Fleets. This data is ordinarily transmitted as part of a transaction in which the Trucker Fleet Card is used to pay the truck stop. The Fleet Card company either supplies the credit for ("funds") the transaction or bills the Fleet directly ("direct bill" or "unfunded") on behalf of the truck stop. For unfunded transactions, the Fleet Card is being used for its Data Capture and Purchase Control features.

35.     The Trucker Fleet Card companies typically are called "third party credit" or "third party billing" companies because they generally do not themselves provide goods or services to the Trucker at the point of sale.

36.     The information that the Trucker Fleet Card companies collect and transmit as part or their Data Capture function enables Truckers and Fleets to monitor and track such things as the location of their trucks, the timing and amount of fuel and other purchases, and other similar information desired by Fleets. Long-haul Fleets rely on such information to control costs, account for purchases, pay appropriate fuel and other taxes, and plan effective use of their assets and employees. Trucker Fleet Cards also provide Fleets and drivers with negotiated or discounted diesel fuel prices and other benefits, including administration of discounts and rebates.

37.     Trucker Fleet Cards, through their Purchase Control functions, enable Fleets and Truckers to limit the dollar amount and type of purchases individual truck drivers can make. Fleet Card Purchase Controls also help Fleets and Truck Stops prevent unauthorized use of Fleet Cards.

38.     Traditional credit cards that merely provide credit tor a fuel purchase-and do not also provide enhanced Data Capture and Purchase Controls to trucking companies (or administration of fuel discounts or rebates)-are not included in the Trucker Fleet Card Market relevant to the antitrust claims asserted in this action. Because consumer credit cards such as, e.g., VISA, MasterCard, American Express, Diner's Club and Discover, do not provide Data Capture or Purchase Control, nor do they serve long-haul Fleets for diesel purchases, they are not part of the Trucker Fleet Card Market relevant here, although GP does process these transactions as well. Also for this reason, payments for fuel by cash are not part of the relevant Trucker Fleet Card Market.

39.     The Federal Trade Commission (the "FTC") has concluded: "Because of the specialized features of [Trucker Fleet Cards], traditional credit cards and other types of Fleet Cards are not acceptable substitutes." FTC Analysis of Proposed Consent Order to Aid Public Comment, Sept. 9, 1999, available at http://www.ftc.govlos/1999/09/ceridiananalysis.htm.

40.     Defendants charge Truck Stops transaction fees for its Fleet Cards at prices that were and are substantially above marginal costs. Defendants have enjoyed high profit margins on these transactions.

41.     Defendants have, and have exercised, in conspiracy with third party Fleet Card processors, the power to impair and exclude competition in the Trucker Fleet Card Market.

42.     The relevant Fleet Card Market is limited to those Fleet Card issuers that serve the long-haul "over the road" Fleets and Truckers.

43.     Defendant Comdata's website boasts: "Comdata Inc., a FleetCor company and world leader in payment innovation, today introduced the Comdata OnRoad Card, the most widely accepted multipurpose fuel and driver funds card in the transportation industry."

44.     Comdata is by far the dominant provider of Trucker Fleet Cards in the Fleet Card Market. Comdata's website has stated that as far back as 1987 the "Comdata Card evolve[d] into an industry standard, providing interactive data management and reporting to more than 100,000 professional drivers and their companies." Even one year after entering into a consent decree in the year 2000 designed to ameliorate Comdata's anticompetitive behavior (discussed below), Comdata still dominated the Trucker Fleet Card Market with a 70% Market-share. See Flying J, Inc. v. ('om data Network, Inc., 405 F.3d 821, 825 (I Oth Cir. 2005) ("Flying J"). Comdata maintains at least that Market share today in the Fleet Card Market. Moreover, Comdata's next largest Trucker Fleet Card competitor has a Market share of less than 20%.

45.     Comdata possesses the ability to preclude or delay new entry into the Trucker Fleet Card Market, to raise rivals' costs in those Markets, to impair the opportunities and efficiencies of rivals, and to control prices and exclude competition.

46.     Truck Stops must obtain authorization from Comdata to accept Comdata Fleet Cards. Comdata typically requires that any agreements authorizing Truck Stops to accept Comdata Fleet Cards be terminable at will, without cause, and on either short notice or without any notice. Because of Comdata's dominance among Truckers and Fleets, Truck Stops would be at a significant competitive disadvantage in seeking Trucker and Fleet business if they could not accept Comdata Fleet Cards. Comdata, thus,

has Truck Stops-individually and collectively-at its mercy, and exercises its monopoly power to exclude competition and extract artificially inf1ated fees from the Truck Stops by requiring that the Truck Stops use their Point of Sale system or one that they designate in order to natively process payments.

47.     Comdata also has the power to influence the volume of fuel sales at Truck Stops. For example, Comdata creates fuel networks that provide fuel discounts to trucking companies at specified Truck Stops that use Comdata services. The vast majority of long-haul Fleets carry the Comdata card. Comdata uses the dominance of its fuel network to steer Truckers to certain favored Truck Stops, enhancing Comdata's economic power over the Truck Stops.

### ii. Fleet Card Point of Sale ("POS") Systems Market

48.     Truck Stops cannot process Trucker Fleet Cards unless they acquire Fleet Card POS systems, which are computer devices that facilitate Fleet Card transactions as well as perform Data Capture and Purchase Control (and other administrative) functions. More specifically, Trucker Fleet Card POS systems have the capacity to: authorize payment promptly; provide Data Capture and transaction processing to third parties, including legal fuel tax receipts; restrict purchases by Truckers (Purchase Controls); administer fuel discounts where applicable; generate reports, including audit trail reports; and relay transaction data from the truck driver to the Trucker Fleet Card company. A Trucker Fleet Card company receives the transaction data that is captured by the POS system so that it can relay that data back to the Fleet for whom the card was issued. A truck stop needs only to retain the data necessary for financial settlement with the Trucker Fleet Card company.

49.     Beginning in approximately 1985, Trendar Corporation developed a popular Trucker Fleet Card POS system for Truck Stops (the "Trendar System"). According to the FTC, Ceridian, Comdata's previous owner, acquired Trendar in 1995 for Comdata. Since that time and up until recently, Comdata has controlled as much as 90% of the Fleet Card POS systems Market. Flying J, 405 F.3d at 825 ("Comdata had secured approximately 90**%** of the point-of-sale systems Market by 2001. Virtually every major U.S. truck stop other than Flying J used the Trendar System.").

50.     Comdata both issues Trucker Fleet Cards to its Fleet customers and processes Trucker Fleet Card transactions through its Fleet Card POS systems that it leases to Truck Stops.

51.     Comdata has the power to maintain supracompetitive prices in the Trucker Fleet Card Market and the Fleet Card POS systems Market. This power equates to the power to raise price substantially above the competitive level without losing so much sales volume as to render the price increase unprofitable. Without competition, a significant, non-transitory price or fee increase by Comdata would not cause a significant loss of its sales to competitors in the Trucker Fleet Card Market or the Fleet Card POS systems Market.

52.     Comdata has now entered into an "end-of-life" phase for its popular Trendar System, informing merchants that it will no longer be offering support for the Trendar System. Instead, Comdata is now requiring customers to purchase their new, and very expensive "SmartDESQ System" in order to continue natively processing Defendants' Fleet Cards.

53.     By no longer offering support for its existing POS Systems, Defendants

are forcing Class members to make unnecessary purchases of additional products at artificially inflated prices in order to continue offering services their customers expect.

54.     Barriers to entry in the Fleet Card Market and the Fleet Card POS systems Market are high. This is so in the Trucker Fleet Card Market because, inter alia, of a "chicken and egg" problem: prospective Market entrants must offer a card widely accepted by Truck Stops in order to be attractive to Trucker Fleets, and widely accepted by Fleets in order to convince Truck Stops to accept the card and pay associated transaction fees. The Trucker Fleet Card Market is also costly and difficult to enter given the necessary technologies involved, which would require a substantial fixed cost investment. There are also significant barriers to entry in the Trucker Fleet Card POS systems Market because, inter alia, prospective Market entrants must be able to accept Comdata Fleet Cards, given their prevalence among Fleets, and therefore must seek and obtain authorization from Comdata to process Trucker Fleet Cards issued by Comdata. There is a "chicken and egg" problem in the Fleet Card POS system Market too: prospective entrants would need to have a presence in a substantial number of Truck Stops in order to convince Trucker Fleet Card companies to authorize processing over the new Fleet Card POS System.

55.     GP made this extremely high fixed cost investment in the technology required to enter the Trucker Fleet Card POS Market based on Defendants allowing them access to the codes and technological specifications necessary to create the technology. However, Defendants are using their monopolistic power to drive out competition by refusing to allow GP's certified program to accept Defendants' Fleet Cards natively, thereby attempting to render GP's product unMarketable and maintain the monopoly.

56.     GP seeks to provide a reasonably priced alternative to Comdata's unreasonably inflated SmartDESQ system, thus providing competition and Market-value pricing to the industry.

57.     Comdata has actively taken measures in an attempt to bar GP's entry to the Fleet Card POS Systems Market including, but not limited to, the following:

a.     Blocking GP's ability to natively process Defendants' Fleet Cards;

b.     Blocking or attempting to block GP's ability to accept Defendants' Fleet Cards using GP's proprietary system of acceptance allowed by existing agreements and laws;

c.     Attempting to intimidate GP into no longer accepting Defendants' Fleet Cards using GP's proprietary system of acceptance allowed by existing agreements and laws;

d.     Informing GP executives that Comdata would not ever allow any competitor into its Market; and

e.     Upon information and belief, terminating the Comdata employee that allowed GP to begin and complete the certification process to natively accept and process Defendants' Fleet Cards.

### iii. Truck Stop Market

58.     Truck stops are located throughout the United States, primarily adjacent to the interstate highway system, including state turnpike systems. Truck stops supply diesel fuel, trucking supplies, food and services (such as, e.g., showers, overnight parking, food, check cashing, internet service, truck repair, etc.) to Fleets, including long-haul over-the-road Fleets, and their truck drivers. Truck stops accept Trucker Fleet Cards and typically

have Fleet Card POS systems on site for processing those cards.

**B. PAST EFFORTS TO STOP DEFENDANTS'ANTICOMPETITVE**
     **CONDUCT HAVE FAILED**

59.    Comdata initially secured its dominant positions in the markets for Trucker Fleet Cards and the market for the Fleet Card POS systems that process those cards, through an aggressive acquisition strategy by Ceridian, Comdata's previous parent company, in the mid- to late-1990s on Comdata's behalf. During that time period Ceridian acquired, e.g.: **(1)** according to the FTC, the Trendar Corporation (in 1995) for Comdata to solidify Comdata's dominance in the Fleet Card POS systems market; and (2) then Fleet Card rival, NTS (from First Data Corporation in 1998), to solidify Comdata's dominance in the Trucker Fleet Card market.

60.    Following these acquisitions, both the FTC and Flying J (a Chain that owns a company that issues the rival TCH Fleet Card) each filed complaints against Comdata and Ceridian alleging, inter alia, that the acquisitions described above constituted violations of the antitrust laws.

61.    The FTC brought an enforcement action specifically charging, inter alia, that the acquisitions of Trendar and NTS "may substantially to lessen competition and to tend to create a monopoly in the relevant markets in violation of Section 7 of the Clayton Act" by increasing the likelihood that customers of Fleet Cards and Fleet Card POS systems "will pay higher prices." The FTC complaint noted the high barriers to entry in both markets and explained, "Prospective entrants into the market for provision of [Trucker Fleet Cards] must be accepted onto [Comdata's] Trendar [POS] system and must establish a nationwide network of truck stop locations that accept their cards.

Potential entrants into the [POS] market must be able to process [Comdata's] Fleet cards in order to be viable options for truck stops." FTC Complaint, In the Matter of Ceridian Corp., No. 3933, April 5, 2000, available at http://www.ftc.gov/os/2000/04/ceridiancomplaint.htm.

62.     The FTC analysis concluded that Comdata had used its monopoly power to preclude or delay competition from rivals:

Comdata ... has the ability to preclude or delay new entry into the fleet card market, and to discipline or disadvantage new entrants or incumbent providers of Fleet cards who seek to compete effectively with Comdata, by denying them access to Trendar's POS system or by granting access only on discriminatory terms. The investigation revealed evidence that Comdata has delayed or denied some fleet card competitors access to Trendar and Comdata has increased the fees to other lirms for Trendar access.

FTC Analysis of Proposed Consent Order to Aid Public Comment, September 9, 1999, available at bttp://www,ftc.gov/os/1999/09/ceridiananalysis.htm.

63.     The FTC concluded further that: "The market for the provision of Fleet card services for over-the-road trucking companies is highly concentrated. Comdata controls the majority of that market and, with its acquisition of NTS, is more than five times larger than its nearest competitor. At the time of its acquisition, NTS was Comdata's closest competitor in the market for fleet card services for over-the-road trucking companies." *Id.*

64.     According to the FTC, Ceridian's acquisitions for Comdata (including Trendar and NTS) violated antitrust laws "because they gave Comdata the power to control entry into, and expansion by existing providers in, both the [Fleet Card POS systems and Trucker Fleet Card markets]." FTC Press Release, "Final Approval Granted in FTC Consent Agreement with Nation's Largest Trucking 'Fleet Card' Issuer," April 6,

2000, available at http://www.ftc.gov/opa/2000/04/ceridiancorp.htm.

65.     Comdata entered into a consent decree with the FTC that became final in April 2000. The consent decree required Comdata, inter alia, to process transactions involving rivals' Trucker Fleet Cards on Comdata's Trendar System and to allow (through royalty-free licenses) three new providers of fleet Card POS systems to process Comdata-issued Trucker Fleet Cards.

66.     Said royalty-free licenses were to be transferable and were designed to ensure competition in the Fleet Card POS Market.

67.     Since that time, Comdata issued the three licenses to potential Fleet Card POS system-provider competitors, but none of those competitors currently competes with Comdata in the Fleet Card POS systems market. Two potential competitors apparently ceased competing in the Fleet Card POS systems market, and Comdata entered into a joint marketing agreement with the third would-be competitor, whose product was incorporated into Comdata's OmniDesq Fleet Card POS system.

68.     Further, the licenses required to be issued by Comdata according to the consent order with the FTC have since expired and are currently either no longer in force or presently subject to revocation.

69.     The FTC's enforcement activities did not succeed in depriving Comdata of its monopoly power in the Trucker Fleet Card market or the Trucker Fleet Card POS systems market, nor was the FTC able to prevent Comdata from abusing its monopoly power in league with Ceridian and third parties as alleged in this Complaint. Indeed, having only been partially thwarted in its monopolization efforts by the FTC, Comdata turned increasingly to conspiring with third parties (through quid pro quo involving the

two-tier pricing), and exclusionary contractual provisions, to maintain and increase its monopoly power in the Trucker Fleet Card market.

70.   In 2001, Comdata settled with Flying J, agreeing to pay Flying J $49 million and to grant prospective relief, including two licenses intended to facilitate the use of the TCH Fleet Card on Comdata's monopoly Trendar Fleet Card POS system in truck stops.

71.   Flying J later brought a legal challenge to Comdata's implementation of the settlement agreement, arguing that Comdata had failed to abide by the agreement, and that in so doing, Comdata had hampered TCH's ability to compete with Comdata in the Trucker Fleet Card market.

72.   The trial court agreed with Flying J that Comdata had breached the settlement agreement.

73.   On appeal, the Tenth Circuit recognized the underlying anticompetitive conduct in which Comdata had engaged:

> When Flying .T entered the [Trucker Fleet Card] market in the mid-1990s, it faced two significant barriers to entry. First, the Trendar System did not accept the [Flying .!-issued] TCH Fuel Card. Merchants using Trendar could not process TCH Fuel Card transactions; therefore, Flying J customers could not use the TCH Fuel Card at Trendar locations. Given the ubiquity of the Trendar System, this was a big problem for Flying J. Second, the record shows that Comdata engaged in a campaign to pressure truck stops not to accept the TCH Fuel Card. . . . Comdata placed over four hundred telephone calls to truck stops and threatened to raise transaction fees on Comdata cards ({they agreed to accept the TCH Fuel Card.

Flying J**,** 405 F.3d at 827 (emphasis added).

74.   Nevertheless, the Tenth Circuit reversed the trial court, concluding that the settlement agreement did not require Comdata to open up the market for Trucker Fleet

Cards in the way that Flying J had argued. The dissent, however, noted the conditions of the market:

> This case is a dispute over a claim that Comdata violated antitrust laws by restricting Flying J's access to the market. On the eve of trial, because Comdata realized it was in jeopardy of an adverse judgment, it agreed to pay forty-nine million dollars to Flying J to compensate for past violations. In addition, to rectify future restrictions on market entry, it entered into the license that is the subject of the dispute on appeal. ... What we do know is that the overall purpose of the license was to open access to the market. ... The district court's selection of the interpretation that favors optimal opening of the competitive market seems to me to be eminently reasonable.

Flying J, 405 F.3d at 838 (McKay, J., dissenting).

75.    The settlement between Flying J and Comdata, like the FTC consent decree, has not protected Truck Stops or would-be Fleet Card POS System providers from anticompetitive conduct, particularly in the Fleet Card markets. Moreover, having failed to exclude the TCH Fleet Card from the Fleet Card market through the use of Comdata's dominant Fleet Card POS system, and having agreed to forego continuing its past pattern of exclusionary conduct, Comdata soon embarked on a new scheme and conspiracy to maintain and enhance its monopoly power through unreasonable restraints on competition in the Fleet Card markets-employing new, but no less effective, exclusionary tactics. Since the time of the Flying J litigation (and the FTC's past efforts to preserve Fleet Card market competition), Comdata increasingly relied on agreements with third parties, and other exclusionary agreements and conduct, to foreclose Fleet Card rivals and increase its monopoly power.

76.    Comdata has leveraged its monopoly power in the Trucker Fleet Card POS systems market to exclude and impair rival issuers from the Trucker Fleet Card market.

77.   By the late 1990s, following its acquisition of the Trendar POS system (which acquisition, according to the FTC, was facilitated by Ceridian), Comdata dominated that Fleet Card POS systems market for processing Trucker Fleet Cards.

78.   When Flying J sought to enter the Trucker Fleet Card market with its TCH-brand Trucker Fleet Card, Comdata programmed its Trendar POS system not to process transactions for customers using the TCH card.

79.   Given Comdata's exclusionary conduct, trucking companies had little incentive even to try the TCH card, regardless of lower pricing or other features and benefits offered. "Merchants using Trendar could not process TCH Fuel Card transactions; therefore, Flying J customers could not use the TCH Fuel Card at Trendar locations. Given the ubiquity of the Trendar System, this was a big problem for Flying J." Flying J, 405 F.3d at 827 (emphasis added).

80.   Comdata's decision not to process TCH transactions on the Trendar POS system erected an unreasonably high barrier to entry for Flying J. Comdata controlled the key to entry to the market-access to transaction processing on the Trendar POS system- and effectively locked the TCH card out of the Trucker Fleet Card market by leveraging its monopoly power in the Fleet Card POS systems market.

81.   Flying J filed suit against Comdata for unlawfully leveraging its monopoly power to impair Flying J's ability to compete in the Trucker Fleet Card market.

82.   Comdata paid Flying J $49 million and agreed to prospective relief- including agreeing to permit TCH and other potential competitors access to its Fleet Card POS system-to settle the lawsuit filed by Flying J and a companion suit filed by the FTC. This prospective relief was ineffectual against the continued anticompetitive conduct in

the Fleet Card Market as alleged herein.

83.    Comdata paid the $49,000,000 settlement, but has continued in the systematic monopolistic behaviors leading to that Class Action because they continue to make billions of dollars as the result of their monopoly.

84.    Comdata continued to abuse its monopoly power in the Fleet Card market and the Fleet Card POS systems market by enlisting third party companies, who were both Comdata's customers and Comdata's actual and potential horizontal competitors in the Fleet Card market, to engage in an anticompetitive scheme including the following elements, among others:

a.    Quid Pro Quo Price Fixing

i.    Beginning in or about the year 2000, Comdata entered into in to a quid pro quo with third party companies in the Truck Stop Market in which Comdata agreed to impose a two-tier transaction fee pricing scheme under which the third party companies were charged a relatively low f1at fee of under $1 per transaction while those third party companies' Truck Stop rivals were saddled with a high percentage-based fee of up to 2.5% per transaction. Before the quid pro quo, Comdata had charged a lower f1at transaction fee to all truck stops.

ii.    Under the prior fee system, not only were the fees lower generally, but there was also a far smaller disparity between the transaction fees among Truck Stops.

iii.    In exchange, these Truck Stops agreed to enhance and support Comdata's dominance in the Fleet Card Market by (i) refusing to accept the rival TCH Fleet Card, (ii) foregoing opportunities, and deferring ongoing efforts, to issue new Fleet Cards in competition with Comdata, (iii) refraining from promotion of their existing Fleet Cards or

inhouse accounts, and (iv) agreeing to restrictive contractual provisions designed to limit their support for, and use of, competing Fleet Cards issued by Comdata's other Fleet Card rivals.

      b.      Threats of Decreased Business:

      i.      Comdata has attempted to impair, and has succeeded in impairing, the entry, growth and success of competitors in the Fleet Card Market, like TCH, by leveraging Comdata's monopoly power in the relevant markets and engaging in a scheme involving both punishments and rewards.

      ii.      These punishments involved Comdata threatening the third party Truck Stops with high transaction fees and steering Fleets away from the third party Truck Stops to rival truck stops if they (or any of them) accepted the TCH card, issued or promoted their own Fleet Cards, or promoted the expansion of other rival Fleet Cards.

      iii.      Before Comdata settled litigation with Flying J in 2001, it placed over four hundred telephone calls to truck stops, threatening to raise transaction fees on Comdata Fleet Cards if they began accepting TCH Fleet cards.

      c.      Entering into Anticompetitive Written Agreements with Third Party Companies in order to Maintain Monopoly Power:

      i.      Comdata entered into separate written agreements with several third party Truck Stops beginning as early as 2001 that included a variety of contractual restrictions, each of which standing alone was designed to, and did, impair and exclude Fleet Card rivals, including actual and potential Fleet Cards from the Truck Stops themselves, and maintain and enhance Comdata's monopoly power and market dominance.

      ii.      Furthermore, Comdata and third party Truck Stops agreed, through written

contracts between Comdata and the third party Truck Stops, that the Truck Stops would offer all Fleets in the Comdata "Fuel Network," or carrying the Comdata Fleet Card, a fuel discount at least as large as the maximum discount each of the Truck Stops extended to a Fleet in a rival "Fuel Network" using a rival Fleet Card. This Complaint refers to these particular contractual restrictions as "Fuel Discount Most Favored Nations" or "Fuel Discount MFN" provisions. These provisions severely impaired the ability of rival Fleet Cards to offer Fleets overall fuel prices lower than those Comdata could offer, despite Comdata's systematically higher transaction fees to the Truck Stops Market.

iii.     The Fuel Discount MFN thus made it economically impossible for a rival Fleet Card to build a robust rival Fuel Network, or to attract large Fleets to switch from Comdata to their Fleet Card using the promise of substantial discounts at Truck Stops. In this way, the Fuel Discount MFN suppressed price competition, blocked and impaired the Truck Stops from dealing with rival Fleet Cards and Fuel Networks, raised rivals' costs, and enhanced Comdata' s market dominance and monopoly power.

iv.     Including a Transaction Fee MFN clause which prevented rival Fleet Cards and a Truck Stop's own Fleet Card from attracting business with a combination of lower overall transaction and fuel pricing. If the Truck Stops tried to pay higher transaction fees to a rival Trucker Fleet Card as part of a larger pricing strategy, the transaction fees on all of Comdata's transactions-i.e., the majority of the truck stop's transactions-would be raised to that higher level. Thus, the Transaction Fee MFN, both standing alone, and in combination with the Fuel Discount MFN, created severe economic disincentives to any possible efforts by the Chain Defendants to promote or expand business with rival Trucker Fleet Cards or a Truck Stop's own Fleet Card as a

means to challenge Comdata's market dominance.

     v.     Comdata's agreements with each of the Truck Stops also barred these Truck Stops from "active sales efforts" to convert Comdata Fleet Card holders to any other Fleet Card network, including to one of the Chain Defendants' own Fleet Cards or in-house accounts, which-given that Comdata was and is the dominant Fleet Card issuer held by the vast majority of Fleets and truckers -severely restricted the growth of the Chains' own Fleet Cards and in-house accounts and prevented and impaired efforts by Fleet Card rivals to encourage the Truck Stops to promote their rival networks.

     vi.     Taken together, Comdata's anticompetitive contractual provisions in its contracts with the Truck Stops have blocked Comdata's Fleet Card rivals from expanding beyond a relatively small market share. Comdata has been able to block rival expansion and growth in the Fleet Card market, despite having fees systematically higher than its Fleet Card rivals and despite the notoriously bad customer service and outmoded technologies.

     vii.     All of the exclusionary contractual provisions described in this Complaint served to maintain and enhance Comdata's monopoly power, and resulted in Comdata's imposition of artificially inflated prices on the Truck Stop Market.

     d.     Entering into Exclusionary Contracts with Fleets:

     i.     The Trucker Fleet Card Market is two-sided. The services are sold to both those seeking to make purchases and those seeking to make sales using Trucker Fleet Cards. Increased market share on one side increases market power on the other side. Increased demand for a Fleet Card by the Trucker Fleets increases the demand for that card among truck stops. Similarly, acceptance or a card by the truck stops increases

demand by the Trucker Fleets.

    ii.    Comdata, since at least 2001, has used and manipulated its relationships with the Trucker Fleets to preserve and increase its monopoly power with respect to the Independents.

    iii.    Additionally, Comdata requires that its Trucker Fleet customers commit to use of the Comdata Fleet card services in order to secure the fuel network discounts. The fuel network discounts are administered by Comdata at the Fleet Card POS System, and require the use of the Comdata Fleet card. Trucker Fleets' compliance with volume commitments associated with the fuel network discounts arc also monitored by Comdata through the Trucker Fleets' use of Comdata Fleet cards at truck stops.

    iv.    Comdata's contracts with Fleets include incentives that require the Fleets to complete certain benchmark levels of their transactions using a Comdata card. Comdata has been granted audit rights to ensure compliance. These restrictive contractual provisions in the Fleet contracts increase Comdata's market power with truck stops, enable Comdata to reward certain Truck Stops (and thus entice the them to support Comdata's exclusionary conduct) and to punish other Truck Stops with less market share, by charging the them supracompetitive transaction and other fees.

    85.    The actions and behaviors contained in the preceding paragraph led to a Class Action being filed by a Class of independent Truck Stops against Comdata, Ceridian, and several large Chain Truck Stops.

    86.    The Class Action eventually led to a Class Settlement Agreement in which Comdata and its then-parent company Ceridian agreed to pay $100,000,000 to the Class Members, as well as several other non-monetary concessions regarding its pricing

structure for a period of five (5) years from the date of the Agreement, which was entered into in January 2014.

87.     Comdata paid the $100,000,000 settlement, but has continued in the systematic monopolistic behaviors leading to that Class Action because they continue to make billions of dollars as the result of their monopoly.

88.     Immediately following the Class Action Settlement in August 2014, Defendant FleetCor, who itself has long been engaged in the  Fleet Card Market, acquired Defendant Comdata from its then- parent company, Ceridian, for $3.45 Billion.

89.     The acquisition of Comdata by FleetCor further increased and strengthened Defendants' already solid monopoly in the Fleet Card Market and Fleet Card POS Market.

90.     Upon acquiring Comdata, FleetCor sought to protect this investment by adopting and promulgating its own anticompetitive behaviors and policies regarding restrictions to the marketplace.

91.     After acquiring Comdata, FleetCor adopted Comdata's restrictive policies and stopped allowing third party Point of Sale Systems to become certified to natively process FleetCor's various Fleet Cards.

92.     After acquiring Comdata, FleetCor adopted Comdata's restrictive policies and began only allowing the then-owned Comdata POS Systems and those that Comdata approved of the pricing structure to accept FleetCor's various Fleet Cards.

93.     FleetCor's involvement in Comdata's daily business affairs is and has been both extensive and ongoing since August 2014.

**C. HARM TO COMPETITION DUE TO THE ANTICOMPETITIVE**

## ACTIONS OF DEFENDANTS

94.     The unlawful anticompetitive actions described in this Complaint maintained and increased Comdata's monopoly power, giving Comdata the ability to artificially increase transaction fees and costs of Comdata POS Systems to Truck Stops and maintain those artificially inflated fees through the present and continuing. This harm to the Truck Stops in the form of artificially high transaction fees and costs, is sufficient by itself to constitute harm to competition under the antitrust laws.

95.     Other than the artificially inflated transaction fees and POS System costs to the Truck Stops, the anticompetitive effects of the behaviors alleged herein include, inter alia:

        a.      reduced competition in the Truck Stop market (because Independents are severely limited in their ability to compete);

        b.      higher retail diesel fuel prices (because Truck Stops are limited in their ability to choose vendors and thereby put downward pressure on prices);

        c.      reduced competition in the Fleet Card POS Market;

        d.      reduced customer service in the Fleet Card POS Market;

        e.      reduced customer satisfaction in the Fleet Card POS Market;

        f.      reduced technological advancement and security.

96.     There arc no legitimate procompetitive justifications for the anticompetitive behaviors alleged in this Complaint, or for any aspect of the anticompetitive actions standing alone, and even if there were, there are less restrictive means of achieving those purported procompetitivc effects. To the extent the anticompetitive actions or any aspect of those actions has any cognizable procompetitive

effects, they are substantially outweighed by the anticompetitive effects.

### D. ANTITRUST INJURY TO PLAINTIFFS AND MEMBERS OF THE CLASS

97.    During the Class Period, Plaintiffs ABC and members of the Class purchased Trucker Fleet Card processing services from Comdata. As a result of Defendants' illegal activities outlined herein—including exclusionary agreements in unreasonable restraint of trade-members of the Class were compelled to pay, and did pay, artificially inflated prices or fees for truck stop payment processing, including artificially inflated transaction fees and artificially inflated costs of Fleet Card POS Systems.

98.    If actual and potential Fleet Card processing companies, including the Defendants themselves and the third party company they entered into exclusionary agreements with, had not agreed not to enter, or been unlawfully discouraged from entering, into agreements to allow GP and others to natively process Defendants' Fleet Cards, or from expanding market share in order to benefit from economies of scale and thus becoming more formidable competitors, Comdata's fees would have been substantially lower, and Truck Stops, including Plaintiffs and the members of the Class, would have paid Comdata substantially less for Trucker Fleet Card processing services both at a transactional level and at a POS System level.

99.    As a consequence, competition in the Trucker Fleet Card POS System Market was substantially harmed, and Plaintiff ABC and members of the Class have sustained, and continue to sustain, substantial losses and damage to their business and property in the form of overcharges on transaction fees and POS System fees paid to Comdata. The full amount of such damages will be calculated after discovery and upon

proof at trial.

100.   The conduct comprising Defendants' wrongful actions is continuing, and so are the overcharges suffered by Plaintiff ABC and the Class caused by said wrongful conduct.

101.   GP obtained authority to certify its Fleet Card POS System to accept and natively process Defendants' Fleet Cards from Defendants. As a result of Defendants' illegal activities outlined herein—including exclusionary agreements in unreasonable restraint of trade-Plaintiff GP expended large sums of money and investment into the technology required to obtain said certifications, only to be prevented from actually natively processing said Fleet Cards by Defendants.

102.   If the Defendants themselves and the third party company they entered into exclusionary agreements with, had not agreed not to enter, or been unlawfully discouraged from entering, into agreements to allow GP and others to natively process Defendants' Fleet Cards, or from expanding market share in order to benefit from economies of scale and thus becoming more formidable competitors, the market value for Fleet Card POS Systems would have been  and would continue to be substantially lower, Comdata's monopoly  in the Fleet Card POS System would be effectively mitigated, and Truck Stops, including Plaintiffs and the members of the Class, would have paid Comdata substantially less for Trucker Fleet Card processing services both at a transactional level and at a POS System level.

103.   As a consequence, competition in the Trucker Fleet Card POS System Market was and continues to be substantially harmed, and Plaintiff GP has sustained, and continues to sustain, substantial losses and damage to their business and property in the

form of blocked access to the market. The full amount of such damages will be calculated after discovery and upon proof at trial.

104.   As a further consequence, competition in the Trucker Fleet Card POS System Market was and continues to be substantially harmed, and Plaintiff ABC and members of the Class have sustained, and continue to sustain, substantial losses and damage to their business and property in the form of overcharges on transaction fees and POS System fees paid to Comdata. The full amount of such damages will be calculated after discovery and upon proof at trial.

105.   The conduct comprising Defendants' wrongful actions is continuing, and so are the damages suffered by Plaintiff GP caused by said wrongful conduct.

## VI.    CLASS ALLEGATION

106.   The Plaintiffs adopt and incorporate by reference each and every allegation contained in paragraphs 3-7, 10-105 of this Complaint as if fully set forth herein.

107.   Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of themselves and a Class of similarly situated individuals, defined as follows:

> Any and all individuals or companies in the continental United States, including the District of Columbia, who were charged inflated transactional  fees or were forced to pay inflated rates for the use of Defendants' truck stop point of sale system or acceptance of Defendants' Fleet Cards from 2014 to the present.

108.   The members of the putative Class are so numerous that joinder of all members is impracticable.

109.   The members of the putative Class are ascertainable by an administratively feasible method.

110.   As of this time, the exact number of members of the putative Class is unknown but, upon information and belief, there would be more than one thousand class members.

111.   The Plaintiffs' treatment by the Defendants is typical of the members of the putative Class. Specifically, the Plaintiffs were required and/or compelled to pay artificially inflated rates by the Defendants for the use of Defendants' truck stop point of sale system due to Defendants' monopolistic control and anticompetitive practices in the Fleet Card Market and truck stop point of sale Market.

112.   The Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel who are competent and experienced in class litigation. The Plaintiffs have no interests that are adverse or antagonistic to the putative Class as a whole.

113.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Since the actual damages suffered by members of the putative Class may be outweighed by the risk to individual members of retaliation by the monopolistic Defendants that could destroy their businesses by withholding Fleet Card acceptance privileges, the expense and burden of individual litigation makes it virtually impossible and impractical for the members of the putative Class to seek redress individually for the wrongful conduct alleged.

114.   Common questions of law or fact exist as to all members of the putative Class, and predominate over any questions that only affect individual members of the putative Class.  Among the questions of law or fact common to the putative Class are:

a.   Whether Defendants were and are a monopoly?

b.  Whether Defendants were and are engaged in monopolistic practices?

c.  Whether Defendants were and are engaged in anticompetitive practices?

d.  Whether Defendants have engaged in anticompetitive behaviors in order to further their monopolistic hold on the Markets?

e.  Whether Defendants have engaged in artificially inflating prices to higher prices and rates than would be in a competitive Market as the result of their monopolistic hold on the Markets?

f.  Whether Defendants have illegally tied pricing of Defendants' Fleet Card processing to the purchase and utilization of Defendants' truck stop point of sale system?

g.  Whether Class members were required to pay inflated processing fees if they attempted to process Defendants' Fleet Cards through a competitor such as GP or by alternate means allowed for?

h.  Whether Defendants entered into agreements with third parties in furtherance of their monopolistic control over the Markets?

i.  Whether Defendants entered into agreements with third parties in order to prevent competition in the Markets?

j.  Whether Class members were required to pay such inflated prices due to Defendants' monopolistic control over the Markets?

115.  The Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a Class Action.

116.   Notice can be provided to the members of the putative Class via United States mail, first class; notice by publication; notice via email; or other appropriate means as may be directed by the Court.

## VII.   CLAIMS FOR RELIEF

### A.   COUNT I: Plaintiffs ABC and Class Members' Claims for Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § l: Unlawful Agreements in Unreasonable Restraint of Trade

117.   The Plaintiffs ABC and Class Members adopt and incorporate by reference each and every allegation contained in paragraphs 3-7, 10-105 of this Complaint as if fully set forth herein.

118.   As set forth above, in violation of § 1 of the Sherman Act, Defendants Comdata and FleetCor, in concert with one another and other third parties, entered into exclusionary agreements in unreasonable restraint of trade, under which the third party agreed not to allow GP to enter in the Fleet Card POS System Market by not allowing them access to natively process Defendants' Fleet Cards.

119.   Plaintiffs allege that in addition to the third party to the illegal agreements, Defendants are engaged in a highly regulated industry, and therefore are able to conspire with one another and are prohibited from acting in concert with one another under Federal Law.

120.   These agreements were an unreasonable restraint of trade meant to perpetuate and strengthen the Defendants' monopoly in the Fleet Card POS System Market. The exclusionary agreements were between parallel companies in the Fleet Card processing market and involved agreements to suppress competition from other companies, including GP, in the Fleet Card POS System market.

121.    Each Defendant has committed at least one overt act to further the conspiracy.

122.    Plaintiffs ABC and members of the Class have been injured in their business or property by Defendants' antitrust violations. The injury to Plaintiffs and the Class consists of paying artificially inflated transaction fees for truck stop payment processing, including artificially high per-transaction fees, as well as paying artificially inflated prices for Fleet Card POS System hardware, software, service, and maintenance. Such injury, in the form of overcharges, is of the type the antitrust laws were designed to prevent, and flows directly from Defendants' unlawful conduct.

**B. COUNT II: Plaintiffs ABC and Class Members' Claims for Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2: Scheme to Monopolize**

123.    The Plaintiffs ABC and Class Members adopt and incorporate by reference each and every allegation contained in paragraphs 3-7, 10-105 of this Complaint as if fully set forth herein.

124.    As set forth above, in violation of § 2 of the Sherman Act, Defendant Comdata and FleetCor, with the involvement and assistance of third party companies, acquired, maintained, and enhanced Comdata's monopoly power in the Trucker Fleet Card Market and Trucker Fleet Card POS System Market by engaging in an exclusionary Scheme to monopolize that impaired Comdata's rivals' opportunities to compete.

125.    Plaintiffs allege that in addition to the third party to the illegal agreements, Defendants are engaged in a highly regulated industry, and therefore are able to conspire with one another and are prohibited from acting in concert with one another under Federal Law.

126.   FleetCor and Comdata intentionally sought to obtain, maintain, and enhance Comdata's monopoly power in the Trucker Fleet Card Market and Trucker Fleet Card POS System Market, beginning with Comdata's parent company Ceridian's 1990s acquisitions of Comdata's main rivals in the Fleet Card market on Comdata's behalf, and continuing through FleetCor's acquisition of Comdata.

127.   Defendants Comdata and FleetCor actively sought to prevent competitors, including GP, from entering into the Fleet Card POS System Market by refusing to allow GP to natively process transactions for Defendants' Fleet Cards after causing GP to spend large investments of time and money and other precious resources in developing technology required to complete the certifications necessary to natively process those transactions. These actions had the purpose and effect of impairing the opportunities of Comdata's rivals, and raising the costs of those rivals. As a result, the Scheme has maintained and extended Comdata's and FleetCor's monopoly power in the Trucker Fleet Card POS System Market.

128.   Defendants Comdata and FleetCor actively sought to prevent competitors, including GP, from entering into the Fleet Card POS System Market by revoking GP's ability to natively process transactions for Defendants' Fleet Cards after causing GP to spend large investments of time and money and other precious resources in developing technology required to complete the certifications necessary to natively process those transactions, and then firing the Comdata employee that granted GP the specifications necessary to complete the certification process. These actions in furtherance of Defendants' monopoly had the purpose and effect of impairing the opportunities of Comdata's rivals, deterring future employees of attempting to violate the anticompetitive

and illegal policies of Defendants, and ultimately barring competition in the market. As a result, the Scheme has maintained and extended Comdata's and FleetCor's monopoly power in the Trucker Fleet Card POS System Market.

129.   Comdata and FleetCor further leveraged monopoly power in the Fleet Card POS systems market by charging an increased transactional rate on Merchants processing Defendants' Fleet Cards accepted using GP's proprietary system which operates, and attempting to prevent GP and its customers, including Plaintiffs ABC, from continuing to accept Defendants' Fleet Cards in accordance with existing agreements and laws, thereby maintaining and enhancing its monopoly power in the Trucker Fleet Card POS System Market.

130.   As part of the monopolization Scheme, Comdata and FleetCor also conspired with the third party, who are not named herein but may be added at a later date, whereby Comdata and FleetCor forced a licensee that would otherwise be allowed to process GP's Fleet Card payments to agree not to allow GP to process Defendants' Fleet Card transactions. These actions had the goal and effect of hampering rival entry into, and expansion in, the Trucker Fleet Card POS System Market, and of maintaining and enhancing Comdata's and FleetCor' s monopoly power.

131.   Plaintiffs ABC and members of the Class have been injured in their business or property by the monopolization Scheme alleged herein. Said Plaintiffs' and the Class's injuries result from paying artificially inflated fees for truck stop payment processing, including artificially high per-transaction fees, as well as paying artificially inflated prices for Fleet Card POS System hardware, software, service, and maintenance. Such injury, in the form of overcharges, is of the type the antitrust laws were designed to

prevent, and flows directly from Defendants' unlawful conduct.

**C.  COUNT III: Plaintiffs ABC and Class Members' Claims for Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2: Conspiracy to Monopolize**

132.   The Plaintiffs ABC and Class Members adopt and incorporate by reference each and every allegation contained in paragraphs 3-7, 10-105 of this Complaint as if fully set forth herein.

133.   As set forth above, in violation of § 2 of the Sherman Act, Defendant Comdata and FleetCor, with the involvement and assistance of third party companies, which are not presently named herein but may be added later, acquired, maintained, and enhanced Comdata's monopoly power in the Trucker Fleet Card Market and Trucker Fleet Card POS System Market by engaging in an exclusionary conspiracy to monopolize that impaired Comdata's rivals' opportunities to compete.

134.   Plaintiffs allege that in addition to the third party to the illegal agreements, Defendants are engaged in a highly regulated industry, and therefore are able to conspire with one another and are prohibited from acting in concert with one another under Federal Law.

135.   FleetCor and Comdata intentionally sought to obtain, maintain, and enhance Comdata's monopoly power in the Trucker Fleet Card Market and Trucker Fleet Card POS System Market, beginning with Comdata's parent company Ceridian's 1990s acquisitions of Comdata's main rivals in the Fleet Card market on Comdata's behalf, and continuing through FleetCor's acquisition of Comdata.

136.   As part of the conspiracy to monopolize, Defendants Comdata and FleetCor actively sought to prevent competitors, including GP, from entering into the

Fleet Card POS System Market by refusing to allow GP to natively process transactions for Defendants' Fleet Cards after causing GP to spend large investments of time and money and other precious resources in developing technology required to complete the certifications necessary to natively process those transactions. These actions had the purpose and effect of impairing the opportunities of Comdata's rivals, and raising the costs of those rivals. As a result, the Scheme has maintained and extended Comdata's and FleetCor's monopoly power in the Trucker Fleet Card POS System Market.

137.    Defendants Comdata and FleetCor actively sought to prevent competitors, including GP, from entering into the Fleet Card POS System Market by revoking GP's ability to natively process transactions for Defendants' Fleet Cards after causing GP to spend large investments of time and money and other precious resources in developing technology required to complete the certifications necessary to natively process those transactions, and then firing the Comdata employee that granted GP the specifications necessary to complete the certification process. These actions in furtherance of Defendants' monopoly had the purpose and effect of impairing the opportunities of Comdata's rivals, deterring future employees of attempting to violate the anticompetitive and illegal policies of Defendants, and ultimately barring competition in the market. As a result, the Scheme has maintained and extended Comdata's and FleetCor's monopoly power in the Trucker Fleet Card POS System Market.

138.    Comdata and FleetCor further leveraged monopoly power in the Fleet Card POS systems market by charging an increased transactional rate on Merchants processing Defendants' Fleet Cards accepted using GP's proprietary system which operates, and attempting to prevent GP and its customers, including Plaintiffs ABC, from

continuing to accept Defendants' Fleet Cards in accordance with existing agreements and laws, thereby maintaining and enhancing its monopoly power in the Trucker Fleet Card POS System Market.

139.   As part of the monopolization Scheme, Comdata and FleetCor also conspired with the third party, who are not named herein but may be added at a later date, whereby Comdata and FleetCor forced a licensee that would otherwise be allowed to process GP's Fleet Card payments to agree not to allow GP to process Defendants' Fleet Card transactions. These actions had the goal and effect of hampering rival entry into, and expansion in, the Trucker Fleet Card POS System Market, and of maintaining and enhancing Comdata's and FleetCor' s monopoly power.

140.   Each Defendant has committed at least one overt act in furtherance of said conspiracy. Each Defendant intended that the conspiracy to monopolize alleged herein would maintain and enhance Comdata's and FleetCor's monopoly power and injure Plaintiffs ABC and the Class thereby.

141.   Plaintiffs ABC and members of the Class have been injured in their business or property by the monopolization Scheme alleged herein. Said Plaintiffs' and the Class's injuries result from paying artificially inflated fees for truck stop payment processing, including artificially high per-transaction fees, as well as paying artificially inflated prices for Fleet Card POS System hardware, software, service, and maintenance. Such injury, in the form of overcharges, is of the type the antitrust laws were designed to prevent, and flows directly from Defendants' unlawful conduct.

   **D. COUNT IV: Plaintiff GP's Claims for Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § l: Unlawful Agreements in Unreasonable Restraint of Trade**

142.   The Plaintiff GP adopts and incorporates by reference each and every allegation contained in paragraphs 2, 4-7, 10-105 of this Complaint as if fully set forth herein.

143.   As set forth above, in violation of § 1 of the Sherman Act, Defendants Comdata and FleetCor, in concert with one another and other third parties, entered into exclusionary agreements in unreasonable restraint of trade, under which the third party agreed not to allow GP to enter in the Fleet Card POS System Market by not allowing them access to natively process Defendants' Fleet Cards.

144.   Plaintiff GP alleges that in addition to the third party to the illegal agreements, Defendants are engaged in a highly regulated industry, and therefore are able to conspire with one another and are prohibited from acting in concert with one another under Federal Law.

145.   These agreements were an unreasonable restraint of trade meant to perpetuate and strengthen the Defendants' monopoly in the Fleet Card POS System Market. The exclusionary agreements were between parallel companies in the Fleet Card processing market and involved agreements to suppress competition from other companies, including GP, in the Fleet Card POS System market.

146.   Each Defendant has committed at least one overt act to further the conspiracy.

147.   Plaintiff GP has been injured in its business or property by Defendants' antitrust violations. Plaintiff GP has sustained, and continues to sustain, substantial losses and damage to their business and property in the form of blocked access to the market. The full amount of such damages will be calculated after discovery and upon proof at

trial. Such injury, in the form of being prohibited from doing business in the market, is of the type the antitrust laws were designed to prevent, and flows directly from Defendants' unlawful conduct.

### E. COUNT V: Plaintiff GP's Claims for Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2: Scheme to Monopolize

148.   The Plaintiff GP adopts and incorporates by reference each and every allegation contained in paragraphs 2, 4-7, 10-105 of this Complaint as if fully set forth herein.

149.   As set forth above, in violation of § 2 of the Sherman Act, Defendant Comdata and FleetCor, with the involvement and assistance of third party companies, acquired, maintained, and enhanced Comdata's monopoly power in the Trucker Fleet Card Market and Trucker Fleet Card POS System Market by engaging in an exclusionary Scheme to monopolize that impaired Comdata's rivals' opportunities to compete.

150.   Plaintiff GP alleges that in addition to the third party to the illegal agreements, Defendants are engaged in a highly regulated industry, and therefore are able to conspire with one another and are prohibited from acting in concert with one another under Federal Law.

151.   FleetCor and Comdata intentionally sought to obtain, maintain, and enhance Comdata's monopoly power in the Trucker Fleet Card Market and Trucker Fleet Card POS System Market, beginning with Comdata's parent company Ceridian's 1990s acquisitions of Comdata's main rivals in the Fleet Card market on Comdata's behalf, and continuing through FleetCor's acquisition of Comdata.

152.   Defendants Comdata and FleetCor actively sought to prevent GP from

entering into the Fleet Card POS System Market by refusing to allow GP to natively process transactions for Defendants' Fleet Cards after causing GP to spend large investments of time and money and other precious resources in developing technology required to complete the certifications necessary to natively process those transactions. These actions had the purpose and effect of impairing the opportunities of GP, as one of Comdata's potential rivals, and raising the costs of GP. As a result, the Scheme has maintained and extended Comdata's and FleetCor's monopoly power in the Trucker Fleet Card POS System Market.

153.   Defendants Comdata and FleetCor actively sought to prevent GP from entering into the Fleet Card POS System Market by revoking GP's ability to natively process transactions for Defendants' Fleet Cards after causing GP to spend large investments of time and money and other precious resources in developing technology required to complete the certifications necessary to natively process those transactions, and then firing the Comdata employee that granted GP the specifications necessary to complete the certification process. These actions in furtherance of Defendants' monopoly had the purpose and effect of impairing the opportunities of GP, as one of Comdata's rivals, deterring future employees of attempting to violate the anticompetitive and illegal policies of Defendants, and ultimately barring GP's competition in the market. As a result, the Scheme has maintained and extended Comdata's and FleetCor's monopoly power in the Trucker Fleet Card POS System Market.

154.   Comdata and FleetCor further leveraged monopoly power in the Fleet Card POS systems market by charging an increased transactional rate on Merchants processing Defendants' Fleet Cards accepted using GP's proprietary system which

operates, and attempting to prevent GP and its customers from continuing to accept Defendants' Fleet Cards in accordance with existing agreements and laws, thereby maintaining and enhancing its monopoly power in the Trucker Fleet Card POS System Market.

155.    As part of the monopolization Scheme, Comdata and FleetCor also conspired with the third party, who are not named herein but may be added at a later date, whereby Comdata and FleetCor forced a licensee that would otherwise be allowed to process GP's Fleet Card payments to agree not to allow GP to process Defendants' Fleet Card transactions. These actions had the goal and effect of hampering rival entry into, and expansion in, the Trucker Fleet Card POS System Market, and of maintaining and enhancing Comdata's and FleetCor' s monopoly power.

156.    Plaintiff GP has been injured in its business or property by Defendants' antitrust violations. Plaintiff GP has sustained, and continues to sustain, substantial losses and damage to their business and property in the form of blocked access to the market. The full amount of such damages will be calculated after discovery and upon proof at trial. Such injury, in the form of being prohibited from doing business in the market, is of the type the antitrust laws were designed to prevent, and flows directly from Defendants' unlawful conduct.

### F.  COUNT VI: Plaintiff GP's Claims for Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2: Conspiracy to Monopolize

157.    The Plaintiff GP adopts and incorporates by reference each and every allegation contained in paragraphs 2, 4-7, 10-105 of this Complaint as if fully set forth herein.

158.   As set forth above, in violation of § 2 of the Sherman Act, Defendant Comdata and FleetCor, with the involvement and assistance of third party companies, which are not presently named herein but may be added later, acquired, maintained, and enhanced Comdata's monopoly power in the Trucker Fleet Card Market and Trucker Fleet Card POS System Market by engaging in an exclusionary conspiracy to monopolize that impaired Comdata's rivals' opportunities to compete.

159.   Plaintiff alleges that in addition to the third party to the illegal agreements, Defendants are engaged in a highly regulated industry, and therefore are able to conspire with one another and are prohibited from acting in concert with one another under Federal Law.

160.   FleetCor and Comdata intentionally sought to obtain, maintain, and enhance Comdata's monopoly power in the Trucker Fleet Card Market and Trucker Fleet Card POS System Market, beginning with Comdata's parent company Ceridian's 1990s acquisitions of Comdata's main rivals in the Fleet Card market on Comdata's behalf, and continuing through FleetCor's acquisition of Comdata.

161.   As part of the conspiracy to monopolize, Defendants Comdata and FleetCor actively sought to prevent GP from entering into the Fleet Card POS System Market by refusing to allow GP to natively process transactions for Defendants' Fleet Cards after causing GP to spend large investments of time and money and other precious resources in developing technology required to complete the certifications necessary to natively process those transactions. These actions had the purpose and effect of impairing the opportunities of GP, as one of Comdata's potential rivals, and raising the costs of GP. As a result, the Scheme has maintained and extended Comdata's and FleetCor's monopoly

power in the Trucker Fleet Card POS System Market.

162.   Defendants Comdata and FleetCor actively sought to prevent GP from entering into the Fleet Card POS System Market by revoking GP's ability to natively process transactions for Defendants' Fleet Cards after causing GP to spend large investments of time and money and other precious resources in developing technology required to complete the certifications necessary to natively process those transactions, and then firing the Comdata employee that granted GP the specifications necessary to complete the certification process. These actions in furtherance of Defendants' monopoly had the purpose and effect of impairing the opportunities of GP, as one of Comdata's potential rivals, deterring future employees of attempting to violate the anticompetitive and illegal policies of Defendants, and ultimately barring GP's access as a competitor in the market. As a result, the Scheme has maintained and extended Comdata's and FleetCor's monopoly power in the Trucker Fleet Card POS System Market.

163.   Comdata and FleetCor further leveraged monopoly power in the Fleet Card POS systems market by charging an increased transactional rate on Merchants processing Defendants' Fleet Cards accepted using GP's proprietary system which operates, and attempting to prevent GP and its customers from continuing to accept Defendants' Fleet Cards in accordance with existing agreements and laws, thereby maintaining and enhancing its monopoly power in the Trucker Fleet Card POS System Market.

164.   As part of the monopolization Scheme, Comdata and FleetCor also conspired with the third party, who are not named herein but may be added at a later date, whereby Comdata and FleetCor forced a licensee that would otherwise be allowed to

process GP's Fleet Card payments to agree not to allow GP to process Defendants' Fleet Card transactions. These actions had the goal and effect of hampering GP's entry into, and expansion in, the Trucker Fleet Card POS System Market, and of maintaining and enhancing Comdata's and FleetCor' s monopoly power.

165.   Each Defendant has committed at least one overt act in furtherance of said conspiracy. Each Defendant intended that the conspiracy to monopolize alleged herein would maintain and enhance Comdata's and FleetCor's monopoly power and injure Plaintiff GP thereby.

166.   Plaintiff ABC and members of the Class have been injured in their business or property by the monopolization Scheme alleged herein. Said Plaintiffs' and the Class's injuries result from paying artificially inflated fees for truck stop payment processing, including artificially high per-transaction fees, as well as paying artificially inflated prices for Fleet Card POS System hardware, software, service, and maintenance. Such injury, in the form of overcharges, is of the type the antitrust laws were designed to prevent, and flows directly from Defendants' unlawful conduct.

167.   Plaintiff GP has been injured in its business or property by Defendants' antitrust violations. Plaintiff GP has sustained, and continues to sustain, substantial losses and damage to their business and property in the form of blocked access to the market. The full amount of such damages will be calculated after discovery and upon proof at trial. Such injury, in the form of being prohibited from doing business in the market, is of the type the antitrust laws were designed to prevent, and flows directly from Defendants' unlawful conduct.

### G. COUNT VII: Plaintiff GP's Claims Injunctive Relief for Actual and Threatened Violation of Sections 1 and 2 of the Sherman Antitrust Act, Under § 16 of the Clayton Act, 15 U.S.C. § 26: Injunctive Relief

168.   The Plaintiff GP adopts and incorporates by reference each and every allegation contained in paragraphs 2, 4-7, 10-105 of this Complaint as if fully set forth herein.

169.   As set forth above, in violation of § 1 and 2 of the Sherman Act, Defendants Comdata and FleetCor, in concert with one another and other third parties, entered into exclusionary agreements in unreasonable restraint of trade, under which the third party agreed not to allow GP to enter in the Fleet Card POS System Market by not allowing them access to natively process Defendants' Fleet Cards.

170.   Plaintiff GP alleges that in addition to the third party to the illegal agreements, Defendants are engaged in a highly regulated industry, and therefore are able to conspire with one another and are prohibited from acting in concert with one another under Federal Law.

171.   These agreements were an unreasonable restraint of trade meant to perpetuate and strengthen the Defendants' monopoly in the Fleet Card POS System Market. The exclusionary agreements were between parallel companies in the Fleet Card processing market and involved agreements to suppress competition from other companies, including GP, in the Fleet Card POS System market.

172.   Further, Defendant Comdata has informed GP of its intention to continue disallowing any competition in the Fleet Card POS System Market in the future, and has taken active steps to prevent, discourage, and frustrate GP in an attempt to maintain a monopoly on the Fleet Card POS System Market.

173.   Each Defendant has committed at least one overt act to further the conspiracy.

174.   Plaintiff GP has been and continues to be injured in its business or property by Defendants' continued and threatened antitrust violations. Plaintiff GP has sustained, and continues to sustain, substantial losses and damage to their business and property in the form of blocked access to the market. The full amount of such damages will be calculated after discovery and upon proof at trial, but is continuing in nature and must be stopped in acordance with existing Federal and state laws. Such injury, in the form of being prohibited from doing business in the market and the continued promise and threat to prohibit GP from doing business in the market, is of the type the antitrust laws were designed to prevent, and flows directly from Defendants' unlawful conduct, and as such GP is entitled to injunctive relief.

## REQUEST FOR RELIEF

I.  Wherefore, Plaintiffs ABC and Class members respectfully request the following:

    A.  Certification of the Class proposed in ths Complaint as a proper class action maintainable under Fed. R. Civ. P. 23;

    B.  Judgment in favor of themselves and the Class they seek to represent and against the Defendants, separately and severally, for damages, measured as the overcharges Plaintiffs and the other members of the Class paid as a result of Defendants' anticompetitive conduct, trebled;

    C.  Punitive damages in an amount according to proof that will deter these Defendants and other potential Defendants from similar wrongful acts in the future;

    D. Pre- and post-judgment interest;

    E. Injunctive relief to prevent further anticompetitive conduct;

    F. Costs of suit, including reasonable attonreys' fees; and

    G. Such other relief a jury may deem just and equitable.

II.  Wherefore, Plaintiff Gas Pos, Inc. respectfully request the following:

    A. Judgment in favor of Plaintiff Gas Pos, Inc. and against the Defendants, separately and severally, for damages, measured as the damage to Plaintiff's business and profits as a result of Defendants' anticompetitive conduct, trebled;

    B. Pre- and post-judgment interest;

    C. Punitive damages in an amount according to proof that will deter these Defendants and other potential Defendants from similar wrongful acts in the future;

    D. Injunctive relief to prevent further anticompetitive conduct;

    E. Injunctive relief to allow GP to effectively compete in the Fleet Card POS System Market;

    F. Injunctive relief to prohibit Defendants from interfering or discouraging GP from competing with Defendants in the future;

    G. Costs of suit, including reasonable attonreys' fees; and

    H. Such other relief a jury may deem just and equitable.

**<u>JURY TRIAL DEMANDED</u>**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Second Consolidated Amended Complaint so triable.

Respectfully submitted this the 5th day of May, 2019.

/s/Cameron Hogan
Cameron Hogan
ASB-1326-N74H

**OF COUNSEL:**
**HOGAN & LLOYD**
2871 Acton Rd, Ste 201
Birmingham, Alabama 35243
T: 205-969-6235
F: 205-969-6239
E: clhogan@lloydhoganlaw.com

**SERVE BY SPECIAL PROCESS SERVER**

Comdata Network, Inc.
Attn: Management
5301 Maryland Way
Brentwood, TN 37027

FleetCor Technologies, Inc.
Attn: Management
5445 Triangle Parkway
Suite 400
Peachtree Corners, GA 30092

/s/Cameron Hogan
Cameron Hogan